# Exhibit A

# MOYNIHAN LAW, P.C.

2 Chatham Center, Suite 230   Pittsburgh, PA 15219
Phone: 412.889.8535   Fax: 800.997.8192

March 18, 2021

**Sent via USPS Certified Mail No. 7017 3040 0000 9360 8938,
Return Receipt Requested**

Quantum3 Group, LLC
12006 98th Ave NE, Suite 200
Kirkland, WA 98034-4218

**Re:     Stacy Ford et al v. Quantum3 Group, LLC et al
Case No.: GD-21-002520
Our Matter No.: 2154-02**

To Whom it May Concern:

Enclosed please find a copy of the Complaint that was electronically filed in the Court of Common
Pleas of Allegheny County, Pennsylvania.

Please feel free to contact me to discuss this matter.

Sincerely,

Mark G. Moynihan, Esq.
Attorney for Plaintiff

MGM/tam
Enc.

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ALLEGHENY_____ County

| For Prothonotary Use Only: | |
|---|---|
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**S E C T I O N   A**

**Commencement of Action:**
- [x] Complaint
- [ ] Transfer from Another Jurisdiction
- [ ] Writ of Summons
- [ ] Petition
- [ ] Declaration of Taking

Lead Plaintiff's Name:
Stacy Ford

Lead Defendant's Name:
Second Round Sub LLC

Are money damages requested? [x] Yes   [ ] No

Dollar Amount Requested:
(check one)
- [ ] within arbitration limits
- [x] outside arbitration limits

Is this a *Class Action Suit*? [x] Yes   [ ] No

Is this an *MDJ Appeal*? [ ] Yes   [x] No

Name of Plaintiff/Appellant's Attorney: __Kevin Abramowicz__

- [ ] Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your *PRIMARY CASE.* If you are making more than one type of claim, check the one that you consider most important.

**S E C T I O N   B**

**TORT** (*do not include Mass Tort*)
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [ ] Product Liability (*does not include mass tort*)
- [ ] Slander/Libel/ Defamation
- [x] Other:

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other:

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional:

**CONTRACT** (*do not include Judgments*)
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other

- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other

- [ ] Other:

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other:

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other

- [ ] Zoning Board
- [ ] Other:

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other:

*Updated 1/1/2011*

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| STACY FORD and STEPHEN FORD, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| | No. |
| Plaintiffs, | CLASS ACTION |
| | **CLASS ACTION COMPLAINT** |
| v. | |
| SECOND ROUND SUB LLC, and QUANTUM3 GROUP LLC, | |
| Defendants. | |

Filed on behalf of Plaintiffs:
Stacy Ford and Stephen Ford

Counsel of record for Plaintiffs:

Kevin Abramowicz
PA ID No. 320659
Kevin Tucker
PA ID No. 312144
**East End Trial Group LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
(412) 223-5740 – office
(412) 626-7101 – fax
kabramowicz@eastendtrialgroup.com
ktucker@eastendtrialgroup.com

*Attorney for Plaintiffs*

Other Attorneys On Signature

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA**

| | |
|---|---|
| STACY FORD and STEPHEN FORD, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| | No. |
| Plaintiffs, | CLASS ACTION |
| v. | |
| SECOND ROUND SUB LLC, and QUANTUM3 GROUP LLC, | |
| Defendants. | |

## NOTICE TO DEFEND

**YOU HAVE BEEN SUED IN COURT.** If you wish to defend against the claims set forth in the following pages, you must take action within **TWENTY (20)** days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Complaint or for any claim or relief requested by the Plaintiffs. You may lose money or property or other rights important to you.

**YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.**

**IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.**

LAWYER REFERRAL SERVICE
Allegheny County Bar Association
11th Floor Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 261-5555

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | |
|---|---|
| STACY FORD and STEPHEN FORD, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| | No. |
| Plaintiffs, | CLASS ACTION |
| v. | |
| SECOND ROUND SUB LLC, and QUANTUM3 GROUP LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Stacy Ford and Stephen Ford (collectively the "Fords" or "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Second Round Sub LLC ("Second Round"), and Quantum3 Group LLC ("Quantum3") (collectively "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      This action seeks damages, attorneys' fees, and costs against Defendants for their violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*

## JURISDICTION AND VENUE

2.      The Court has subject matter jurisdiction over the claims at issue under 28 U.S.C. § 1331 and 15 U.S.C. § 1692.

3.      The Court has personal jurisdiction over Defendants because the claims at issue arose in this district and Defendants do substantial business in this district.

4.      Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events and/or omissions at issue occurred in this district.

## PARTIES

5.      The Fords are residents of Allegheny County, Pennsylvania.

6.      Second Round is a corporation with a principal place of business in Austin,

Texas.

7.      Quantum3 is a corporation with a principal place of business in Kirkland,

Washington.

8.      Second Round buys consumer debt and attempts to collect that debt for profit.

9.      Second Round purchases consumer debt at steep discounts, most (if not all) times

for pennies on the dollar.

10.     Quantum3 helps debt collectors like Second Round to collect debt from

consumers.

11.     Second Round hired Quantum3 to assist it in the collection of debt with respect to

the Fords and the classes (as defined below).

12.     Defendants use instrumentalities of interstate commerce, such as telephone, mail,

and the internet, to collect on debt.

## FACTUAL ALLEGATIONS

13.     On March 20, 2020, Defendants filed a proof of claim in the Fords' bankruptcy

case in an attempt to collect a debt (the "POC").

14.     The POC concerned a Synchrony Bank account (the "Account").

15.     The Account was used for personal, family, and/or household purposes.

16.     The POC represented that the Account was owed in the amount of $5,081.95.

17.     The POC also represented this amount did not include interest or other charges.

18.     A balance itemization sheet attached to the POC repeated these representations.

4

19.     On May 21, 2020, the Fords objected to the POC on the basis that it did not accurately reflect the amount owed.

20.     On June 4, 2020, Defendants filed an amended POC.

21.     Like the first POC, the amended POC represented that the Account was owed in the amount of $5,081.95, and that this amount did not include interest or other charges.

22.     Defendants, however, attached documents related to the Account that stated otherwise.

23.     For example, the Account's charge-off statement represented the Account's principal balance was 4,320.47 at charge-off and that the Account accrued $761.71 in finance charges at the time of charge-off.

24.     According to the statements attached to the amended POC, the Account included purchases and cash advances, and the interest charged on these balances was as high as 19.99%.

25.     The statements also represented that fees had been charged but did not disclose in what amounts.

26.     Defendants failed to attach enough statements to allow the Fords to calculate the amount Defendants claimed was owed.

27.     Defendants attested to the accuracy and truthfulness of the representations made in their POCs under the penalty of perjury.

28.     Defendants' representations in the POCs were false, misleading, and deceptive, because Defendants represented that the Account did not include interest and fees when the Account actually included interest and fees.

29.     Defendants knew they overstated the principal owed on the Account and that the Account included interest and fees because the creditor gave written records to Defendants when Defendants allegedly bought the Account.

30.     These records showed the Account included principal, interest, and fees.

31.     Defendants knew the Account included principal, interest, and fees.

32.     Despite this knowledge, Defendants instructed their employees and agents to file the POCs, falsely overstating the principal owed on the Account and falsely asserting that no interest or fees were included in the Account.

33.     Defendants regularly file POCs that only list principal on the defaulted open-end credit accounts that Defendants purchase, even though Defendants know the accurate amount of principal, interest, and fees owed on the accounts underlying Defendants' claims.

34.     Defendants' practice of misreporting the principal, interest, and fees on the proofs of claim it files in consumer bankruptcy cases is a material violation of the FDCPA.

35.     Although it always was necessary to accurately list principal, interest, and fees on debts underlying proofs of claim, the bankruptcy rules were amended in 2011 to specifically require the itemization of interest and fees on proof of claim filings regarding open-end consumer credit accounts. *See In re Maddux*, 567 B.R. 489, 493-95, 500 (Bankr. E.D. Va. 2016); Fed. R. Bankr. P. 3001(c)(2)(A).

36.     The purpose of this amendment is obvious: the accurate disclosure of principal, interest, and fees is necessary to properly and fully evaluate claims filed in bankruptcy proceedings. *See* Fed. R. Bankr. P. 3001(c)(2) Advisory Committee's Notes to 2011 amendments ("Subdivision (c)(2) is added to require additional information to accompany proofs of claim filed in cases in which the debtor is an individual. When the holder of a claim seeks to recover—

6

in addition to the principal amount of a debt—interest, fees, expenses, or other charges, the proof of claim must be accompanied by a statement itemizing these additional amounts with sufficient specificity to make clear the basis for the claimed amount.").

37.     By intentionally misstating the principal owed, and by falsely stating that no interest or fees are included in a proof of claim, creditors and debt collectors deny debtors the information necessary to evaluate proof of claim filings.

38.     Defendants routinely and intentionally misstate the principal, interest, and fees on proofs of claim despite knowing that this conduct deprives debtors of the information necessary to evaluate Defendants' claims.

39.     Defendants' routine misstatements are also harmful because the misstatements conceal the fact that Defendants are attempting to collect interest and fees they are not permitted by law to charge or collect.

40.     The Account included interest and fees charged on purchases and cash advances at a rate of up to 19.99%.

41.     Several courts have held that the entire balance of a credit card is a direct loan governed by a law called the Consumer Discount Company Act ("CDCA"). *See, e.g.*, *Lutz v. Portfolio Recovery Assocs., LLC*, No. 20-cv-676, 2021 U.S. Dist. LEXIS 9052 (W.D. Pa. Jan. 19, 2021); *Hutchison v. Cavalry SPV I LLC*, No. 19-cv-1001, 2020 U.S. Dist. LEXIS 182146 (W.D. Pa. Oct. 1, 2020).

42.     And it has long been recognized that cash advances are direct loans governed by the CDCA. *See, e.g.*, Exhibit 1, pp. 19-20, Department of Banking Letter (Nov. 19, 2011).

43.     The CDCA prohibits debt buyers from charging, collecting, contracting for, or receiving interest and fees that exceed the interest a debt collector is permitted by law to charge without a CDCA license. 7 P.S. § 6203.A.

44.     Debt buyers without a CDCA license cannot charge more than 6% simple interest per year. 41 P.S. § 201(a).

45.     Neither Second Round nor Quantaum3 holds a license under the CDCA.

46.     In fact, neither is licensed under any Pennsylvania law.

47.     The CDCA accordingly limits Defendants to charging, collecting, contracting for, or receiving no more than 6% simple interest per year.

48.     Yet Defendants allegedly bought the Account and attempted to collect and receive its full balance, even though the Account included interest and fees that aggregated above 6% simple interest.

49.     By purchasing the Account, Defendants contracted for interest above 6%.

50.     And by attempting to collect the Account, Defendants attempted to collect and receive interest above 6%.

51.     Defendants were not permitted by law to contract for, collect, or receive the full balance of the Account because Defendants did not obtain a CDCA license to attempt to collect and receive interest above the default 6% cap provided in 41 P.S. § 201(a).

52.     Defendants concealed and failed to disclose this fact by filing POCs that did not itemize the Account or provide account statements concerning the composition of the Account.

53.     Accordingly, the rights of the Fords and other similarly situated individuals were harmed as Defendants misrepresented the composition of the debts at issue in various proofs of

claim and Defendants attempted to charge, contract for, collect, and receive interest and fees Defendants were not permitted by law to charge, contract for, collect, or receive.

54.     As a result of Defendants' actions, the rights of the Fords and those similarly situated were violated, and the Fords and the class members suffered injury in fact.

## CLASS ALLEGATIONS

55.     Plaintiffs bring this action individually and on behalf of all others similarly situated under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

56.     Plaintiffs seek to certify the following classes:

**The Proof of Claim Class**

"All individuals with a bankruptcy filed in Pennsylvania in which Defendants, within the applicable statute of limitations, filed a proof of claim seeking to collect on an open-end credit account without itemizing the interest and fees on the debt underlying the proof of claim."

**The CDCA Class**

"All individuals with a bankruptcy filed in Pennsylvania in which Defendants, within the applicable statute of limitations, filed a proof of claim seeking to charge, contract for, collect, or receive interest and fees that aggregated in excess of 6% on the debt underlying the proof of claim."

57.     The Fords reserve the right to expand, narrow, or otherwise modify the classes as the litigation continues and discovery proceeds.

58.     Numerosity: The classes are so numerous that joinder is impracticable. On information and belief, the members of the classes number in the hundreds.

59.     Ascertainability: The classes are ascertainable because Defendants, the courts, and creditors maintain and collect relevant information on each class member.

60.    Typicality: Plaintiffs' claims are typical of the claims of the classes because the claims of Plaintiffs and the classes are based on the same legal theories and arise from the same conduct.

61.    Commonality and Predominance: Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of this litigation and predominate over any individual issues. For instance, each class member requires the same evidence and the same legal arguments to prove whether Defendants' practice of overstating principal and falsely stating that their proofs of claim include no interest or fees, as well as Defendants' practice of attempting to collect interest and fees Defendants are not permitted by law to charge or collect, is unlawful. Similarly, Defendants' practice of overstating principal and falsely stating that their proofs of claim include no interest or fees, as well as Defendants' practice of attempting to collect interest and fees that Defendants are not permitted by law to charge or collect, either is unlawful as to all class members or as to none of them. These common questions and other similar common questions of law and fact will drive the resolution of this litigation and predominate over any individual issues.

62.    Adequacy: Plaintiffs are adequate representatives of the classes because Plaintiffs' interests do not conflict with the interests of the class members. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the classes, and Plaintiffs have no interests antagonistic to the classes. Plaintiffs also have retained counsel who are competent and experienced in the prosecution of class action litigation generally, and FDCPA litigation on a class and individual basis specifically.

63.    Superiority: The injury sustained by each class member is not of such magnitude that it is economically feasible to prosecute individual actions against Defendants. Requiring

10

many injured plaintiffs to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. By contrast, class treatment presents far fewer management difficulties and provides benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

**COUNT I**
**Violation of the Fair Debt Collection Practices Act**
**15 U.S.C. §§ 1692, <i>et seq.</i>**

64.     This claim is brought individually and on behalf of the classes.

65.     Plaintiffs are consumers, the Account is a debt, and Defendants are debt collectors under the FDCPA. 15 U.S.C. §§ 1692a(3), (5), (6).

66.     Defendants' actions and practices described herein constitute false, deceptive, or misleading representations or means in connection with the collection of a debt, in violation of 15 U.S.C. § 1692e, and unfair or unconscionable means to collect or attempt to collect any debt, in violation of 15 U.S.C. § 1692f.

67.     As a result of Defendants' failure to comply with the provisions of the FDCPA, and the resulting injury and harm Defendants' failure caused, Plaintiffs and the class members are entitled to actual damages, statutory damages, and attorneys' fees and costs under 15 U.S.C. § 1692k.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

a.     An order certifying the proposed classes;

b.     An order appointing Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

c.     An order awarding actual, statutory, and all other damages available by law, along with pre-and post-judgment interest;

11

d.      An order awarding attorneys' fees and costs;

e.      An order declaring Defendants' conduct unlawful;

f.      An order awarding all other relief that is just, equitable, and
        appropriate.

## **JURY TRIAL DEMANDED**

Plaintiffs request a jury trial on all claims so triable.

Respectfully Submitted,

Dated: March 18, 2021                By:   /s/ Kevin Abramowicz
                                           Kevin Abramowicz
                                           Kevin Tucker
                                           **East End Trial Group LLC**
                                           6901 Lynn Way, Suite 215
                                           Pittsburgh, PA 15208
                                           (412) 223-5740
                                           kabramowicz@eastendtrialgroup.com
                                           ktucker@eastendtrialgroup.com

                                           Mark G. Moynihan
                                           **Moynihan Law PC**
                                           2 Chatham Center, Suite 230
                                           Pittsburgh, PA 15219
                                           (412) 889-8535
                                           mark@moynihanlaw.net

                                           *Attorneys for Plaintiffs*

12

## **VERIFICATION**

The undersigned, Mark G. Moynihan, states that he is the attorney for the Plaintiffs, Stacy Ford and Stephen Ford, he is authorized to take this Verification on behalf of the said Plaintiffs and verifies that the statements made in the foregoing Complaint are true and correct to the best of his knowledge, information and belief, based upon the information provided to him by the Plaintiffs. A Verification signed by the Plaintiffs will be provided to Defendants upon request. The undersigned understands that false statements herein are made subject to the penalties of 18 Pa.C.S § 4904, relating to unsworn falsification to authorities.

Dated: March 17, 2021                              /s/ Mark G. Moynihan
                                                   Mark G. Moynihan

                                                   *Attorney for Plaintiffs*

13

# EXHIBIT 1

November 19, 2001

*************************
************************
*****************************
************
****************************

Dear ***************:

This letter will respond to the letter ("Letter") that you sent to Mr. Victor Seesholtz, Chief of the Compliance Division ("Division") of the Pennsylvania Department of Banking ("Department"), concerning numerous issues you raised about your client's ("Client") plans to engage in certain activities that may fall under the jurisdiction of the Consumer Discount Company Act ("CDCA"), 7 P.S. § 6201 *et seq*.  This letter will address the issues that you raised in the order that you raised them in your Letter.

*Background*

Client is a ******** corporation that was incorporated during the summer of **** and has its principal office located in *************.  Client is a wholly owned subsidiary of a [redacted].  Client intends to purchase what you describe in your letter as "distressed consumer debt", Letter at 1, from creditors either once or on an ongoing basis. Client will purchase these distressed consumer debts by assignment from the creditors in question.  You explain that Client intends to purchase by assignment the following kinds of debt:

1. charged-off credit card accounts from lenders, banks, or other chartered financial institutions
2. charged-off credit card accounts from retail merchants or sellers
3. charged-off retail installment paper
4. charged-off motor vehicle paper
5. charged-off closed-end installment loans, or charged-off revolving loan accounts, from state or federally chartered financial institutions that either originated the account or acquired the account

6. charged-off closed-end installment loans or revolving loan accounts from creditors or assignors that are not state or federally chartered financial institutions.

You note in your Letter that Client does not intend to purchase loans secured by residential real estate. You also explain that, although Client will own the accounts in question, Client will not employ collection personnel and will not directly collect or "enforce", Letter at 2, the accounts. Rather, the actual collection efforts related to the debts purchased by Client will be done exclusively by state licensed collection agencies[1] or outside counsel, presumably hired by Client. You further state that Client currently contemplates collecting (by and through its collection agents) only the balance due on the debts on the date of purchase by the Client without Client assessing any additional interest, fees, or other charges. However, you also state that, at some point in the future, Client may consider charging and collecting up to six percent interest on the balance due on a debt, but will never seek to collect interest in excess of six percent.[2]

Finally, you explain Client's plans to purchase consumer credit accounts that involve debtors who have filed for protection under the bankruptcy statutes of the United States.

*Questions #1 and #2*

You state in your letter:

> [a]s I understand, the interpretation of the CDCA by the Department, only a domestic Pennsylvania corporation, or a foreign corporation that has filed for 'domestication,' can obtain such license, and a licensee must maintain an office in Pennsylvania.

Letter at 3.

*Answer*

Your understanding is correct. Under the CDCA, a license may only be granted to a, "domestic business corporation organized under or existing by virtue of the Business Corporation Law of this Commonwealth." 7 P.S. §6203.A. In addition, foreign corporations that have become domesticated pursuant to the Pennsylvania Business Corporation Law may also be licensed under the CDCA, since such domesticated foreign corporations are no longer considered to be foreign business corporations and have all of the powers and privileges of domestic business corporations. *See* 15 Pa.C.S. §§ 4161 – 4162; *August 29, 1996 Letter of Staff Counsel Valentino F. DeGiorgio III.*

---

[1] The Department only issues a separate license to engage in collection activity to collector-repossers under the Motor Vehicle Sales Finance Act, 69 P.S. § 601 *et seq.*

[2] The Department assumes that by six percent you mean six percent simple interest *per annum.*

You are also correct in your understanding that the CDCA requires a licensee to have an office in Pennsylvania.  Section 3.A. of the CDCA specifically refers to activity, "in this Commonwealth."  7 P.S. § 6203.A.  In addition, the CDCA specifically refers to a licensee's principal place of business in Pennsylvania.  7 P.S. § 6208.  Furthermore, the license issued to a licensee must specify an office address.  *Id.*  The Department takes the position that it is the intention of the General Assembly that each licensee shall have a principal place of business in Pennsylvania.

*Question #3*

You state in your Letter:

> [a]s I understand the manner in which the Department interprets the CDCA, the licensing obligation applies to entities making or brokering closed-end installment loans for $25,000 or less, or revolving loan accounts with a credit line up to $25,000, and charging or collecting interest in excess of the interest rate that the lender otherwise would be permitted to charge.

Letter at 4.

*Answer*

The scope of the CDCA is set by Section 3 which states:

> A.    On and after the effective date of this act, no person shall engage or continue to engage in this Commonwealth, either as principal, employe, agent or broker, in the business of negotiating or making loans or advances of money *[or]* credit, in the amount or value of twenty-five thousand dollars ($25,000) or less, and charge, collect, contract for or receive interest, discount, bonus, fees, fines, commissions, charges, or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced, or on the unpaid principal balances when the contract is payable by stated installments except a domestic business corporation organized under or existing by virtue of the Business Corporation Law of this Commonwealth, after first obtaining a license from the Secretary of Banking of the Commonwealth of Pennsylvania in accordance with the provisions of this act.

3

B.    Any person who shall hold himself out as willing or able to arrange for or negotiate such loans of twenty-five thousand dollars ($25,000), or less where the interest, discount, bonus, fees, fines, commissions or other considerations in the aggregate exceeds the interest that the lender would otherwise be permitted by law to charge or who solicits prospective borrowers of such loans of twenty-five thousand dollars ($25,000), or less shall be deemed to be engaged in the business contemplated by this act, unless otherwise permitted by law to engage in such activities. The referring borrowers to a licensee shall not be deemed to be engaged in the business contemplated by this act if no charge, no matter how denominated, for such reference is imposed on the prospective borrower by the person making the reference.  No licensee shall knowingly include in any loan under this act any amount which is to be paid by the borrower to another as a fee or charge, no matter how denominated, for referring said borrower to the licensee.

7 P.S. § 6203 (emphasis added).  You will note that instead of reproducing the phrase, "loans or advances of money on credit" as that phrase appears in Purdon's Pennsylvania Statutes at 7 P.S. ? 6203.A, the Department reproduced above, "loans or advances of money *or* credit".  Through research and study, the Department has discovered that an unofficial error changed the Purdon's text of Section 3.A. from "or" to "on".

As originally enacted in 1937, Section 3.A of the CDCA stated, "the business of negotiating or making loans or advances of money *or* credit . . ." Act of April 8, 1937, P.L. 262, No. 66, § 3 (emphasis added).  However, the text of Section 3.A of the CDCA in Purdon's Pennsylvania Statutes Annotated currently reads, "the business of negotiating or making loans or advances of money *on* credit . . ." 7 P.S. § 6203.A (emphasis added).  The change from the word "or" to the word "on" was the result of an unofficial error when the statute was amended in 1963 by the Act of July 30, 163, P.L. 335, No. 183, § 1 ("1963 Amendment").  A review of the text of the 1963 Amendment immediately reveals that the word "on" in Section 3.A of the CDCA was neither in italics, which would indicate new language, nor in brackets, which would indicate deleted language.  The purpose of the 1963 Amendment, insofar as it amended Section 3.A of the CDCA, was simply to change the dollar figure in Section 3.A of the CDCA from $2,000 to $3,500.  Thus, it was <u>not</u> the intention of the General Assembly to change the word "or" in Section 3.A to the word "on."  This is why Section 18 of the CDCA (penalties) still reads in Purdon's in relevant part, ". . . and who shall engage in the business of negotiating or making loans or advances of money *or* credit . . ." 7 P.S. § 6218 (emphasis added).

An understanding of this issue is important because, by using the word "or" in Section 3.A above in 1937, the General Assembly included within the scope of the CDCA, "the business of negotiating or making . . . loans or advances of . . . credit." Act of April 8, 1937, P.L. 262, No. 66, § 3.  The ability to lend credit is well recognized.

*Gray v. Brackenridge, 2 P&W 75 (Pa. 1830)*; 45 American Jurisprudence, Second Edition, Interest and Usury, ? 113. The word "advance" *may* be the equivalent of the word "loan." *See Words and Phrases, Volume 2A, "Advance; Advances," West Publishing Co. (1955).*

Thus, the General Assembly intended the CDCA to apply broadly to all loans or advances of money or credit. For example, at the time the CDCA was enacted in 1937, Pennsylvania courts generally held that the credit a store advanced to a customer was not a loan that was subject to usury laws. *See Melnicoff v. Huber Investment Co., 12 D. & C. 405 (1929)*, cited with approval by *Equitable Credit and Discount Company v. Geier, 21 A.2d 53, 58 n. 7 (Pa. 1941)*. However, because Section 3.A of the CDCA applies to loans or advances of credit as well as to loans or advances of money, such store credit transactions would fall within the scope of the CDCA were it not for the exception for such transactions found in Section 17 of the CDCA.

Based on the foregoing, it is clear that, as enacted and as currently in force, the CDCA was intended to govern loans or advances of money or loans or advances of credit. Exceptions to the CDCA are found in Section 17 of that act. All loans or advances of money or credit that meet the other jurisdictional requirements of Section 3.A of the CDCA fall under the jurisdiction of the CDCA unless they are the subject of an exception in Section 17 or it is otherwise clear that the person making such a loan or advance has the legal authority to engage in that activity.

*Question #4*

You state in your Letter that, "[t]he general usury ceiling for these types of obligations in Pennsylvania is six percent per year."

*Answer*

Your statement is generally correct. The general usury statute in Pennsylvania is referred to as the Loan Interest and Protection Law ("LIPL") and is found at 41 P.S. § 101 *et seq.* Section 201 of the LIPL states:

> Except as provided in Article III of this act, the maximum lawful rate of interest for the loan or use of money in an amount of fifty thousand dollars ($50,000) or less in all cases where no express contract shall have been made for a less rate shall be six per cent per annum.

41 P.S. § 101 *et seq.* However, as the text of the LIPL indicates, there are exceptions to this interest rate limitation for various kinds of loans. 41 P.S. §§ 301-302. Of course, if a lender is otherwise authorized to charge a particular interest rate, then the general limit of six per cent *per annum* found in the LIPL does not apply. 41 P.S. ? 604.

*Question #5*

You state in your letter:

> [a]lthough the CDCA does not expressly impose a license obligation merely to acquire or purchase loans regulated under the CDCA, the Department takes the position that an entity acquiring loans regulated under the CDCA must have the authority to charge interest at the note rate if it exceeds this general interest rate ceiling.  If an entity does not have such interest rate authority, then the purchasing entity must either obtain a license or collect interest on the account that does not exceed this general usury limit in the Commonwealth.

Letter at 4.

*Answer*

The Department disagrees with your conclusion that the CDCA does not impose a licensing obligation on people who acquire or purchase loans or advances of money or credit that fall under the jurisdiction of that act and, for the following reasons, believes that the General Assembly intended to impose just such a licensing obligation.

*Title of Act*

First, the very title of the act gives evidence that the scope of the CDCA includes the sale of loans.[3]  The word "discount", which is part of the title of the CDCA ("Consumer ***Discount*** Company Act") was explained by one Pennsylvania court as follows:

> [d]iscount, as we have seen, is the difference between the price and the amount of the debt, the evidence of which is ***transferred***.

*Professional Service Credit Association, Inc. v. O'Hara, 40 D. & C. 291, 296 (1940)* (emphasis added; citations and quotation marks omitted).  This demonstrates the intention of the General Assembly to require licensure even to buy and sell loans or advances of money or credit falling under the jurisdiction of the CDCA.

*"Negotiating"*

Second, the text of the CDCA imposes a licensing obligation to buy and sell loans or advances of money or credit that fall under the scope of the CDCA.  Section 3.A of the CDCA specifically requires a person to obtain a license if that person is in the business

---

[3] "The title and preamble of a statue may be considered in the construction thereof." 1 Pa.C.S. § 1924.

of, "negotiating," 7 P.S. § 6203.A, loans or advances of money or credit.  In the world of lending and finance, the word "negotiate" includes arranging a transaction, but it also means more than that.  The CDCA was enacted in 1937, *see* Act of April 8, 1937, P.L. 262, No. 66, and a legal dictionary from that era defines the word negotiate as follows:

> [t]he power to negotiate a bill or note is the power to indorse and deliver it to another, so that the right of action thereon shall pass to the indorser or holder.  42 Md. 581. See 69 N.Y. 386; 30 Minn. 408.  A note transferred by delivery is negotiated; 49 Mo. App. 153.  A national bank, under the power to negotiate evidences of debt, may exchange government bonds for registered bonds; 69 N.Y. 383.

> To negotiate is a general word coming to us from the Latin and signifies to carry on negotiations concerning, and so to conduct business, to conclude a contract or to transfer or arrange.  70 S.W. 186.

Bouvier's Law Dictionary, Baldwin's Century Edition (1934) (Banks-Baldwin Law Publishing Company) at page 843.  Thus, at the time of the enactment of the CDCA, the word "negotiate" was used to describe, among other things, the transfer of evidences of debt.  *See also Alford v. Raschiatore, 63 A.2d 366, 368 (Pa. Super. 1949),* which interpreted "negotiate" broadly in a regulatory context and differently from another statute in light of legislative intent.  The meaning of "negotiate" as it existed when the CDCA was enacted is still used today since "negotiate" is defined as, among other things, "to transfer (as a bill of exchange) to another by delivery or endorsement." *Merriam Webster's Collegiate Dictionary (1993 10th Ed.).  See also* 13 Pa.C.S. § 3201 (definition of "negotiation" in Pennsylvania version of the Uniform Commercial Code).

*Collecting or Receiving Unpaid Principal Balances*

Third, section 3.A of the CDCA requires licensure under the CDCA when a person would:

> . . . charge, ___*collect*___, ___*contract for*___ or ___*receive*___ interest, discount, bonus, fees, fines, commissions, charges, or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced, or ___*on the unpaid principal balances*___ when the contract is payable by stated installments . . .

7 P.S. § 6203.A (emphasis added).  Thus, licensure is required under the CDCA for any person who collects, contracts for or receives unpaid principal balances.  The Department notes that those are some of the activities that Client seeks to engage in.

*Legislative History*

Fourth, the CDCA was passed "on the basis of", *Geier, 21 A.2d at 57*, a report written by Secretary of Banking Luther Harr that was submitted to the Pennsylvania House of Representatives in 1937. *See* Report from the Department of Banking in Pursuance to Resolution No. 180 Session 1936 Study Operation of Small Loan Companies, Appendix to the Legislative Journal, Sessions of 1937 Page 7554 *et seq*. ("Report"). A copy of the Report is attached for your review. A review of the Report reveals that the CDCA was passed as comprehensive legislation designed to protect Pennsylvania consumers from exorbitant interest rates while at the same time making credit available from legitimate lenders. As the Report puts it:

> the borrowing public must be protected against extortionate interest charges and the rates allowed must be sufficient to permit the lender to earn a fair return on his invested capital.

Report at 7563. Much of the Report is devoted to an analysis of the Department's experience with the Small Loans Act, Act of June 17, 1915 (P.L. 1012, No. 432), repealed by Act of March 3, 1976 (P.L. 40, No. 18). Part of that experience included the Department interceding on behalf of consumers to protect them from strident collection practices:

> [t]he licenses under the Small Loans Act of Pennsylvania are issued by the Secretary of Banking. The licenses are issued only after a careful investigation has been made of the character and reputation of the applicants. At least once each year the Secretary of Banking through his representatives makes an examination of the affairs of every licensed lender. The scope of this examination covers not only the legal aspects of the business but takes into consideration also the moral obligation of the lender to the borrowing public and society in general. ***The Department will not permit a lender to use harsh and unconscionable collection methods on delinquent borrowers who are unable to pay by reason of unfortunate circumstances. On the other hand, the Department cannot protect the borrower who is able to pay his just obligation but resists every attempt of the lender to collect.***

Report at 7555 (emphasis added). This passage of the Report is especially relevant to your inquiry since Client proposes to engage in collection activity by and through outside counsel or state licensed collection agencies. Letter at 2. From the foregoing, it is clear that the Department used its authority under the Small Loans Act to protect consumers

8

throughout the entire life of a loan, including when collection activity became necessary, and not just when a loan was originated. The Department's experience with the Small Loans Act formed the basis of the CDCA and it is only reasonable to conclude that the General Assembly intended for the Department to continue to play the same kind of role under the CDCA and, thus, licensure is required even to buy and sell CDCA loan contracts. In light of this interpretation, the Department has promulgated regulations that govern the treatment of a consumer's collateral. 10 Pa. Code § 41.5.

*Purpose of the CDCA*

Fifth, if licensure under the CDCA was not generally required to purchase loans or advances of money or credit made pursuant to the CDCA and collect the remaining balances at the rates and charges authorized by the CDCA, the ability to protect consumers from harsh and obstreperous collection practices would be completely thwarted. In addition, it was also not the intention of the General Assembly to allow people to avoid licensure under the CDCA simply by acquiring such debts by assignment from their originators.

*Sale of Loan Contracts Regulated*

Sixth, the Department has consistently interpreted the CDCA as governing the sale of CDCA loan contracts. The Department has promulgated a regulation that explains when and how loan contracts may be sold or otherwise disposed of. As the pertinent provision states:

> [a] prospective licensee shall notify the Administrator of a contemplated purchase of contracts from a licensee and furnish the name and address of the licensee from whom the contracts will be purchased, the total number of contracts to be purchased, and the total outstanding principal balances thereof. Failure to comply with this subsection may preclude a prospective licensee from obtaining a license. A licensee shall obtain prior approval of the Administrator for the purchase of contracts from another licensee and for the sale of contracts to another licensee. Requests for approval of purchase or sale of contracts shall state the name and address of the licensee from whom the contracts are to be purchased or to whom they are to be sold, the total number of contracts and the total outstanding principal balances thereof. ***A licensee may not sell or otherwise dispose of contracts to a person or corporation not holding a license under the act, unless prior written approval is obtained from the Administrator. The privilege of collecting the charges authorized by the act may not be transferred to an unlicensed purchaser.*** This subsection shall not apply to:

9

    (1)  The purchase or transfer of loan contracts between licensees under the same management and control.

    (2)  The occasional sale or transfer of a loan contract to an out-of-State affiliate to effect the collection thereof, or for the convenience of a consumer.

    (3)  The transfer of a loan contract by a licensee to any maker or person secondarily liable on the contract.

10 Pa. Code § 41.6(a) (emphasis added). After this regulation was promulgated, the CDCA itself was amended in 1998 to only require CDCA licensees to notify the Department when it was selling loan contracts to other CDCA licensees rather than seek the Department's approval. 7 P.S. § 6214.I. However, CDCA licenses must still seek the prior written approval of the Department when they seek to sell loan contracts to non-licensees. Id. To the extent that the regulation conflicts with the new statutory amendment, the statutory amendment prevails. Under both the CDCA itself and the regulation promulgated by the Department, a licensee may not sell loan contracts entered into under the CDCA to an unlicensed person or entity without the Department's prior approval.

      Please note that a line of cases discusses whether certain transactions involving the sale of promissory notes constituted loans under the CDCA. *See Medical Dental Business Service of New Jersey, Inc. v. Morrison, Secretary of the Commonwealth, 51 D. & C. 552 (1944), Professional Service Credit Association, Inc., supra; General Motors Acceptance Corporation v. Freeman, Secretary of Banking, 63 D. & C. 163 (1946)*. The central question in all of those cases was whether or not the transaction was a loan governed by the CDCA or merely a sale of negotiable notes not intended as a loan. As one court put it:

> [s]urely, if this were a fair sale of these notes, which unquestionably petitioner might lawfully purchase for less than the sum due upon them, and afterward receive the whole amount with interest, the legality of such a sale we could not question. But, as already pointed out, the character and circumstances of this transaction bespeak it to be a loan notwithstanding petitioner speaks of it as a sale.

*Medical Dental Business Service of New Jersey, Inc., 51 D. & C. at 558*. Since the facts in your letter presume that the transactions involve a CDCA loan, these cases are not on point and provide no safe harbor for Client to buy and sell CDCA loans.

*Statutory Authority Required to Charge or Collect Interest*

      Seventh, the Department's interpretation that the CDCA imposes a licensing obligation even merely to buy and sell CDCA loan contracts, including the regulation reproduced above, is supported in part by the rule that a person or entity needs some kind

of statutory authority to charge more than the general usury rate of 6% *per annum* simple interest.  As the Pennsylvania Supreme Court has held:

> [a]t common law the taking of any interest whatever was illegal, and the right to charge it, being a privilege granted by statute, is subject to legislative control.

*Geier, 21 A.2d at 58.  Accord* 41 P.S. § 604.  And, in addition to the making of usurious loans, the prohibition against usury applies to any person who collects usurious interest, such as when a person or entity has purchased a loan.  41 P.S. § 502.[4]  Also, the privilege of charging interest in excess of the general usury rate may not be transferred to a person not licensed under the CDCA, 10 Pa. Code § 41.6(a), and neither may a license issued under the CDCA be transferred or assigned.  7 P.S. § 6208.

*Law of Assignment; Banks and other Statutorily Authorized Lenders*

Eighth, Client proposes to purchase loan contracts through assignment.  Under Pennsylvania law:

> an assignment extinguishes the assignor's right to performance by the obligor and transfers that right to the assignee . . . 'The assignee stands in the same shoes as the assignor.'

*Southall v. Humbert, 685 A.2d 574, 579 (Pa.Super.Ct. 1996).*  Therefore, in order for Client to "stand in the same shoes" as a licensee under the CDCA, Client must obtain its own statutorily conferred right to charge and collect interest, fees and other charges in excess of the general usury rate of 6% *per annum* simple interest.  Otherwise, the Department would only approve the sale of CDCA loan contracts to an unlicensed person or entity if the unlicensed person or entity purchasing the CDCA loan contracts formally agreed, pursuant to a written contract, to only charge the general usury rate of 6% *per annum* simple interest on a loan contract even though much higher interest rates and charges are authorized under the contract in question.

---

[4]  Based on the text of the prior 18th century Pennsylvania usury statute, Act of 2d March 1723, that is no longer in force, it was the taking or receiving of usurious interest that was prohibited, not bargaining for it.  As the Pennsylvania Supreme Court has held, "[t]he offence consists not in *bargaining* for more than six per cent., but in *taking* it on any bond or contract."  Craig v. Pleiss, 26 Pa. 271 (Pa. 1856).  This rule was changed by the 1858 Pennsylvania usury statute which is also no longer in force ("[s]ince the passage of the [1858 usury statute] above referred to, it is not unlawful for a debtor to pay, or a creditor to receive more than six per cent. interest." *Stayton, to use of Bryan v. Riddle, 7 A. 72 (Pa. 1886).*  But regardless of the rules that existed prior to the enactment of the CDCA, the CDCA makes it unlawful to even, "charge, collect, contract for or receive interest, discount, bonus, fees, fines, commissions, charges or other considerations."  7 P.S. § 6203.A.  In addition, the text of the current usury statute is broader than its predecessor, *see* 41 P.S. § 201, and debtors who are aggrieved by usury may maintain their action under the usury statute against the person, "who has ***collected*** such excess interest or charges."  41 P.S. ? 502 (emphasis added).

On the other hand, the Department would not object to a CDCA licensee selling loan contracts made pursuant to the CDCA to a bank or other lender that is not licensed under the CDCA if the bank or other lender in question is authorized by law to make loans and charge and receive interest and fees at the same or higher rate and in the same or higher amounts that are authorized by the CDCA. The logic to this is very clear. The CDCA specifically states that:

> [t]his act shall not affect any existing laws, special or general, authorizing a charge for the loan of money in excess of interest at the legal rate. This act shall not apply to any person, persons, partnership, association or corporation operating under the laws related to banking institutions, building and loan associations, credit unions or licensed under the Small Loans Act, approved June seventeen, one thousand nine hundred fifteen, and supplements or amendments, or licensed by the Secretary of Banking of the Commonwealth of Pennsylvania under the provisions of any other statute.

7 P.S. § 6217. *See also* 7 P.S. § 6203.A (concerning interest, fees and other charges that, "aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act . . ."). Thus, the CDCA is not intended in any way to hinder or impair the ability of other entities authorized to originate loans, charge and receive interest, and buy and sell loan contracts and promissory notes, including depository institutions. For instance, the U.S. Supreme Court has held that:

> [t]he sale of mortgages and 'other evidences of debt' acquired by way of loan or discount with a view to reinvestment is, we think, within the recognized limits of the incidental powers of national banks.

First National Bank of Hartford, Wisconsin v. City of Hartford, 273 U.S. 548, 560 (1927). Pennsylvania state-chartered banks enjoy the same, if not greater, powers. 7 P.S. §§ 201(a)(ix), 303, and 315(i). *See also* 7 P.S. § 307. Thus, the Department would not object if a CDCA licensee sold loan contracts to national banks or Pennsylvania state-chartered banks provided the Department was satisfied that the bank in any particular transaction was authorized to charge and receive the interest and other fees provided for in the loan contract, promissory note and other documents to be assigned and no other regulatory concerns were present. Naturally, the CDCA licensee selling loans to banks would still be required to obtain the Department's approval pursuant to 7 P.S. § 6214.I and 10 Pa. Code § 41.6(a).

Of course, if a bank later decides to sell a loan contract that it purchased by assignment from a CDCA licensee, the person or entity to which the bank proposes to sell the loan must be similarly authorized by statute to charge and receive the interest provided for in the loan contract in question. If the person or entity is not so authorized,

12

it would run afoul of the general usury statute and the CDCA, although the bank in question would not otherwise need the Department's prior written approval to sell such a CDCA loan contract unless required by a statute other than the CDCA or regulation or order stemming from the CDCA, since a bank is not a CDCA licensee. *See* 10 Pa. Code § 41.6(a), 7 P.S. § 6214.I.

*Consequences of Not Obtaining a License*

The Department notes that the consequences of not obtaining a CDCA license when required by law to do so can be severe. For instance, criminal penalties apply. 7 P.S. § 6218.

In addition, a CDCA loan contract that has been bought by a person not holding a CDCA license and not otherwise authorized to buy CDCA loan contracts may be declared void. The Pennsylvania Supreme Court has held that:

> . . . the general rule that an agreement which ***violates a provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void***. Where a contract is found to be ***against public policy***, "it cannot, under any circumstances, be made the basis of a cause of action. The law when appealed to will have nothing to do with it, but will leave the parties just in the condition in which it finds them." . . . [W]henever it appears that the enforcement of a contract would violate public policy the court should refuse to proceed in an action based solely upon it, and should dismiss the proceedings of its own motion.

*American Association of Meat Processors v. Casualty Reciprocal Exchange, 588 A.2d 491, 495-496 (Pa. 1991)* (emphasis added). Given the Department's interpretation of Section 3.A, it is clear that a CDCA loan contract that has been purchased by a person who lacks the authority to do so cannot be performed without violating the CDCA. Therefore, such a CDCA loan contract might very well be void under the holding of *American, supra.*[5]

---

[5] In *Anderson v. Automobile Fund, 391 A.2d 642 (Pa. Super. Ct. 1978) (court equally divided, thus lower court affirmed)*, the Pennsylvania Superior Court had the opportunity to discuss whether a violation of the CDCA voided a loan contract under the equitable doctrine of rescission. *Id., 391 A.2d at 648*. The opinion in support of affirmance and remand, which was the only opinion that discussed this issue, found no violation of the CDCA, so it declined to discuss the effect of a violation of the CDCA on a loan contract stating that it is, "unnecessary to decide whether the civil remedy of rescission of the loan agreement would be a proper remedy for violation of the C.D.C.A." *Id.* However, rescinding a contract is not the same as declaring it void. When a court rescinds a contract, the parties are returned, as nearly as possible, to their original positions. *Baker v. Cambridge Chase Inc., 725 A.2d 757 (Pa.Super.Ct. 1999)*. However, when a contract is declared void, as in *American*, "[t]he law when appealed to will leave the parties just in the condition in which it finds them." *American, 588 A.2d at 495*. Thus, when a contract is declared void, the parties are left in the same position as when they came to court, which, in turn, may result in a windfall for the debtors. It is clear from the foregoing that the court in *Anderson* did not address declaring a CDCA

It is especially important to note that part of the public policy concerns that compelled the Pennsylvania Supreme Court to declare the contract in *American* void were based on the effect such a contract would have on a Pennsylvania administrative agency. As the court states:

> [w]hat we consider controlling, however, on the question of waiver, is that the alleged contract is illegal under a statute enacted in aid of significant public policies identified by the Pennsylvania legislature. The Pennsylvania Workmen's Compensation Act is humanitarian and remedial in its purpose, which is to provide workmen and their families a quick and sure means of payment for workrelated injuries without resort to litigation. *See Wagner v. national Indemnity Co., 492 Pa. 154, 422 A.2d 1061 (1980).* The insurance Department Act of 1921 empowers the Insurance Commissioner to administer and enforce the insurance laws in large part to insure the solvency of insurance companies, which, in the workers' compensation field, is essential to protect the rights of injured workers. Unauthorized favorable insurance rates, such as those allegedly offered by Casualty in this case, ***undermine the ability of the Insurance Commissioner to protect the sources of compensation benefits which are indispensable to the welfare of injured workers.***

*American, 588 A.2d at 495* (emphasis added). Similarly, the purchase of CDCA loan contracts by people who are unauthorized to do so undermines the ability of the Department to protect consumers from excessive charges and abusive loan collection practices.

Fully in line with the Pennsylvania Supreme Court's holding in *American*, and based on similar policy concerns, courts in other states have specifically held that loan contracts issued by money lenders or creditors in violation of state licensing statutes are not enforceable in spite of the fact that the relevant statute did not expressly provide for such a consequence. *See Solomon v. Gilmore, 731 A.2d 280 (Conn. 1999); Derico v. Duncan, 410 So. 2d 27 (Ala. 1982);*[6] *Levison v. Boas, 150 Cal. 185 (1907). See also 29 A.L.R. 4th 884 (1984) ("Annotation: Failure of Moneylender or Creditor Engaged in Business of Making Loans to Procure License or Permit as Affecting Validity or Enforceability of Contract").* Thus, even though the CDCA does not specifically state that loan contracts illegally sold to unauthorized people or entities are void, a

---

loan contract void when it referenced rescission and, to the best of the Department's knowledge, no Pennsylvania court has ruled on this issue.

[6] The Alabama legislature subsequently amended the statute in question in *Derico* to reverse, at least in part, the holding of the Alabama Supreme Court in that case. *See Farmer v. Hypo Holdings, 675 So. 2d 387 (Ala. 1996).*

Pennsylvania court might easily conclude that the failure to obtain a CDCA license to buy and sell CDCA loan contracts voids those CDCA contracts.

It appears that, aside from the goal of simply complying with the CDCA and the regulations promulgated thereunder, obtaining the Department's prior approval to acquire CDCA loan contracts may also serve to immunize such a purchaser from acquiring void CDCA loan contracts since that purchaser would lawfully be in possession of such contracts. Thus, in addition to facing criminal penalties, economic hardship could accompany a person or entity that unlawfully buys or sells CDCA loan contracts.

Please note that the consequence of a loan contract becoming void is different from the remedy typically applied in a usury case. Pursuant to the LIPL, a person who has been charged excess interest may refuse to pay such excess interest, 41 P.S. § 501, and may recover triple the amount of excess interest actually paid. 41 P.S. § 502. *See also* 69 P.S. § 631.C (installment sale contract under Motor Vehicle Sales Finance Act not enforceable in so far as prohibited costs or charges are concerned). The difference between the typical usury situation of paying excessive interest and the situation described in this letter may be that a person who buys and sells CDCA loan contracts without the requisite CDCA license has evaded the licensing scheme set up by the General Assembly to protect Pennsylvania consumers and may not in any way ever perform such CDCA contracts in a lawful manner.

There is also another issue that the Department raises for the purpose of recognizing it **but on which the Department finds it unnecessary to take an official position at this time**. Whenever a loan contract is sold, it is typical in the world of lending and finance for other documents to be sold in the same transaction including promissory notes. The question is what effect, if any, does the CDCA have on the sale of promissory notes that are related to CDCA loan transactions? Indeed, the word "contract" in the CDCA is broadly defined to include not only simple loan contracts but also promissory notes and, "any other form of negotiable or nonnegotiable instrument evidencing an agreement to pay a sum certain in money at a fixed or determinable time . . ." 7 P.S. § 6202 ("contract"). It was clearly the intention of the General Assembly for the CDCA to regulate all aspects of a transaction subject to the CDCA, including promissory notes. Indeed, the Department's regulations governing the CDCA apply to promissory notes and the like. *See* 10 Pa. Code § 41.3 (g) and (o).

Pennsylvania's current version of the Uniform Commercial Code ("UCC") governs promissory notes and other similar instruments. One set of defenses to paying on an instrument like a promissory note includes, "duress, lack of legal capacity or ***illegality of the transaction which, under other law, nullifies the obligation of the obligor.***" 13 Pa.C.S. § 3305(a)(1)(ii) (emphasis added). The comments that accompany this statutory text make it clear that other applicable law, and not the UCC, govern the notion of illegality:

> [i]llegality is most frequently a matter of gambling or usury, but may arise in other forms under a variety of

> statutes.   The statutes differ in their provisions and the
> interpretations given them.   They are primarily a matter of
> local concern and local policy.   All such matters are
> therefore left to the local law.   If under the law the effect of
> the duress or the illegality is to make the obligation entirely
> null and void, the defense may be asserted against a holder
> in due course.   Otherwise it is cut off.

Uniform Commercial Code Comment – 1990, accompanying 13 Pa.C.S. § 3305(a)(1)(ii).
It is clear that the effect of the illegality involved must be to completely void the
obligation in question for this defense to be effective.   As explained above, a CDCA loan
contract that is illegally acquired might very well be void.   The question remains though
as to what effect does an illegal and void CDCA loan contract have on a related
promissory note.   As one leading commentator has put it:

> [t]ypically the issuing or transferring of commercial paper
> is one event in a group of related events.   Whether illegality
> with respect to one of the other related events has any
> effect upon the commercial paper issued or transferred
> cannot be predetermined because the courts have not
> articulated any general rule that can be applied.

*Ronald A. Anderson, Anderson on the Uniform Commercial Code, § 3-305:154 (3ʳᵈ ed.
1997) (1998 revision).*   While some states have held that an illegal transaction also makes
the accompanying note void, others have held that the illegality of a transaction does not
affect a related note.   *Id.* at § 3-305:148 – 169.   The Department has been unable to find
any decision from a Pennsylvania state court that is directly on point[7] and **the
Department does not take an official position on this particular issue at this time**
since it is unnecessary to decide the questions presented in your Letter.   However, as
noted above, by defining the word "contract" broadly to include promissory notes and all
other kinds of negotiable and nonnegotiable instruments, 7 P.S. § 6202, the CDCA would
not seem to draw a distinction between a CDCA loan transaction and a related
promissory note.   In addition, a rule that would allow unauthorized people who have
illegally bought CDCA loan contracts to enforce the promissory notes that accompanied
such CDCA loan contracts might very well defeat the entire regulatory scheme erected by
the General Assembly when it enacted the CDCA.   This could be an unreasonable, if not
absurd, result not intended by the General Assembly.   1 Pa.C.S. § 1922(1).   But as noted

---

[7] As noted above, some cases have discussed the difference between making a loan and the sale of a note.
*Medical Dental Business Service of New Jersey, Inc., Professional Service Credit Association, Inc.,
General Motors Acceptance Corporation, supra*.   But the issue in those cases was whether or not the sale
of notes  and the overall transaction constituted a loan under the CDCA.   Those cases did not address the
need for licensure to buy and sell loans that fall under the jurisdiction of the CDCA.   The same is true for a
related line of cases that explains that a purchaser of notes may not use the defense of usury against the
person from whom the notes were purchased.   *See Seltzer v. Sokoloff, 153 A. 724 (Pa. 1931); Sork v. C.
Trevor Dunham, Inc. 163 A. 315 (Pa.Super.Ct. 1932); Personal Discount Company v. Lincoln Tire
Company, 67 D.&C. 35 (1949); Musolf v. Central Standard Life Insurance Company, 40 Erie 189 (1956).*

above, **the Department expressly declines to take an official position on what effect an illegal and void CDCA loan contract has on a related promissory note.**

Please note that the Department's interpretation of the word "negotiate" or "negotiating" in this letter is specific to the CDCA and based on the intention of the General Assembly. Whether or not "negotiate" has the same meaning in other statutes under the Department's jurisdiction is a different inquiry requiring an analysis of the General Assembly's intention concerning the particular law in question. For instance, under the Mortgage Bankers and Brokers and Consumer Equity Protection Act, 63 P.S. § 456.101 et seq. ("MBBCEPA"), the definition of a mortgage broker is, "[a] person who directly or indirectly _**negotiates**_ or places mortgage loans for others _**in the primary market**_ for consideration." 63 P.S. § 456.302 (emphasis added). Since the definition of a mortgage broker is limited to negotiating in the primary market, it is doubtful that the General Assembly intended to govern mortgage brokering in the secondary market by enacting the MBBCEPA. While the Department does not decide this issue at this time, this discussion serves to illustrate the point that the meaning of the word "negotiate" or "negotiating" in a statute is specific to the statute in question and may vary from law to law.

_Question #6_

You state in your Letter:

> From a review of the CDCA and our conversation, it is my understanding that a license under the CDCA is not needed to purchase (i) lender or bank credit card accounts or (ii) retail merchant or seller credit card accounts, as credit cards are not subject to regulation under the CDCA.

Letter at 4.

_Answer_

As discussed above, the scope of Section 3.A of the CDCA is very broad and includes, "negotiating or making loans or advances of . . . credit." 7 P.S. § 6203.A. In addition, there are at least two cases[8] decided at the trial court level in Pennsylvania that

---

[8] _See Medical Dental Business Service of New Jersey, Inc. v. Morrison_, 1944 Pa. D. &. C. LEXIS 161, 12 ("[s]urely what petitioner intends to do is to advance money to the payee of the note and advance credit to the maker of the note. To compel the Secretary of the Commonwealth to issue a certificate of authority would put this foreign corporation, whether it negotiates or makes loans or advances of money or credit, in a more fortunate position than domestic corporations, in that a foreign corporation would be free from the control of the Department of Banking while a domestic corporation engaging in the same business would be subject to such control."). _See also Weaver, Grose, Langhart & May Inc. v. Myers_, 17 D. & C. 2d 405, 412 (1958) (emphasis in original) ("[i]n Tyson v. The School Directors of Halifax Township, 51 Pa. 9 (1855), the Supreme Court defined '_advances of money_' as 'furnishing of money or goods for others in expectation of reimbursement.' In Insurance Company v. Dutcher, 95 U.S. 269, 272 (1877), the United States Supreme Court held that the lending of money to a person does not require that such person actually

could lead to the conclusion that, absent some legislative direction to the contrary, credit cards may, depending on the circumstances, fall under the jurisdiction of the CDCA.[9]

Pennsylvania courts have held that the credit stores give to customers who purchase goods is not generally subject to usury laws. As the Pennsylvania Supreme Court has put it:

> [o]f course, all sale or lease contracts which extend credit are, to a certain extent, akin to the making of loans, but where a greater charge is exacted in the case of a sale on credit than in a cash sale it is included in the selling price of the article. It being uniformly held that sellers are free to contract with buyers as to the terms and conditions of sales, the financing [by sellers] of sales of merchandise by the extension of credit has never been considered subject to the prohibition of usury or to regulations applicable to banking and loan transactions.

*Geier, 21 A.2d at 58*. This doctrine applies to the sale of both goods and services. *Equipment Finance, Inc. v. Grannas, 218 A.2d 81, 82 (Pa.Super.Ct. 1966), citing Melnicoff, supra)*. However, since the CDCA broadly applies to any loan or advance of money or credit, 7 P.S. § 6203, it was necessary for the General Assembly to exempt credit sales of personal property from its scope. As the pertinent provision states:

> [t]his act shall not apply to any bona fide sale of personal property by a person regularly engaged in the sale of such personal property, wherein the purchaser may pay any part or all of the purchase price in stated installments, nor to any such bona fide sale under a conditional sale contract, lease or bailment, wherein the purchaser, lessee or bailee has the option of becoming, or is bound to become, the owner of the property upon full compliance with the terms of the agreement.

7 P.S. § 6217. Thus, the General Assembly incorporated the common law doctrine mentioned above (concerning the credit that stores provide to customers) into the CDCA (prior to enacting the Goods and Services Installment Sales Act) insofar as it applied to sellers selling and financing the same sale of personal property since the CDCA would otherwise have abrogated that doctrine.

---

receive the moneys loaned, where the lender confers a benefit to the borrower in moneys worth equal to such loan by satisfying an existing indebtedness."

[9] Of course, Section 17 of the CDCA makes it clear that financing transactions that involve the *bona fide* sale of personal property are, under most circumstances, not governed by the CDCA. 7 P.S. § 6217. *See also Geier, 21 A.2d at 58*. So credit cards for those and other purposes excepted in Section 17 of the CDCA would not be governed by that act. Otherwise, it may be possible.

Noticeably absent from the exemptions of Section 17 of the CDCA is a similar exemption for the sale of services.  Thus, it would appear that the General Assembly intended to abrogate the common law doctrine referred to above (i.e. that the credit that stores provide to customers who purchase goods is not generally subject to usury laws) by enacting the CDCA insofar as a loan or advance of credit related to the sale of services.  "Exceptions expressed in a statute shall be construed to exclude all others."  1 Pa.C.S. § 1924.  However, the Pennsylvania courts appear to have ignored that nuance, since cases discussing the CDCA have glossed over or ignored the absence of an exemption for the sale of services.  *See, e.g., Professional Service Credit Association, supra.*  Any potential conflict or ambiguity was mooted by the enactment of the Goods and Services Installment Sales Act ("GSISA"), 69 P.S. § 1101 *et seq.*

By enacting the GSISA, the General Assembly provided a framework to govern credit sales involving goods and services.  In addition, by Act of March 25, 1982, P.L. 199, No. 68, the General Assembly amended the GSISA and made it clear that:

> [n]otwithstanding any other act, this act [the GSISA] shall exclusively govern and regulate the terms and conditions of all extensions of credit by the means of credit cards and credit card operations for the purchase of goods and services within this Commonwealth ***but excluding cash advances***.

69 P.S. § 1104 (emphasis added).  Thus, regardless of the CDCA, the GSISA was intended to govern credit cards insofar as they were used to purchase goods and services.  However, the use of credit cards for cash advances remained subject to usury laws.  *Id.*

Legislation enacted later in time by the General Assembly provided alternative bases for certain lenders to operate credit card programs.  For instance, in addition to the authority under the GSISA, Pennsylvania state-chartered banks and, by operation of the National Bank Act, 12 U.S.C. § 85, national banks, may use Section 322 of the Banking Code of 1965, 7 P.S. § 322, as an alternative basis of authority to operate credit card programs.  *See* Act of December 28, 1994, P.L. 1424, No. 167, Sections 4-6.  *Accord Simplification and Availability of Bank Credit – Statement of Policy, 10 Pa. Code §13.51.*  Since Section 322 governs cash advances, this provides broader authority than the GSISA.  *Compare* 7 P.S. ? 322 *with* 69 P.S. § 1104.

The Department takes the position that, depending upon the kind of lender involved, there are different bases upon which a credit card program may be operated.  Since Client intends to purchase credit card accounts by assignment, the question you present is whether Client may, "stand[s] in the same shoes as the assignor."  *Southall, 685 A.2d at 579.*  If the credit card accounts purchased by Client are governed by the GSISA, no licensure is required under the CDCA and Client need only follow the GSISA and other applicable laws to collect on those accounts.  If, however, the credit card accounts Client intends to purchase are governed by some other authority, such as Section 322 of the Banking Code of 1965, then Client would need to find some way to gain the lawful

authority to stand in the shoes of the originating lender and comply with the governing statute.  And if the credit card accounts Client seeks to purchase by assignment involve cash advances, then the GSISA provides no safe harbor, 69 P.S. § 1104, and Client must acquire the lawful authority charge the interest, fees and other charges imposed by the lender for those cash advances.

*Question #7*

You state in your letter:

> A license under the CDCA also is not needed to acquire retail installment paper or motor vehicle installment paper, as such credit transactions also are not regulated thereunder.

Letter at 4.

*Answer*

The Department agrees with your assertion with respect to retail installment paper insofar as the contracts in question are governed by the GSISA; otherwise licensure under the CDCA might be required for the sale of services.

The Department also agrees with your assertion with respect to motor vehicle installment paper since the CDCA provides an exemption for such financing. *See* 7 P.S. § 6217.  However, generally speaking, the Motor Vehicle Sales Finance Act, 69 P.S. § 601 *et seq.*, governs installment sale contracts for motor vehicles and you are <u>strongly</u> advised to review that act for its applicability to Client's proposed business plans.

*Question #8*

You state in your letter:

> In addition, as I also understand, a CDCA license would not be needed to purchase accounts subject to the CDCA (such as (i) closed-end installment loans or (ii) revolving loan accounts) from federally or state-chartered financial depository institutions (such as banks, savings banks, savings and loan associations, or credit unions, among others) that originated the loan or the account, as such entities would have authority to originate loans otherwise subject to the CDCA without a license.

*Answer*

The Department disagrees with your assertion as explained in detail above.  Client would need to obtain its own independent statutory authority to charge and receive the interest, fees and other charges imposed by the loan contract and promissory note in question.

Question #9

You state in your letter:

> [m]oreover, it is my understanding that it is also well-settled that a licensing obligation would arise under the CDCA for an entity to acquire closed-end installment loans of $25,000 or less, or revolving loan accounts with a credit line of $25,000 or less, from CDCA licensees who originated such credit obligations only if the acquiring entity intended to charge or collect interest at a rate that exceeds the six percent general usury ceiling.  As the Company would not be seeking to impose, charge, or collect any interest on the balance on the loan once acquired, the Company would not need to be licensed under the CDCA to acquire such credit obligations.  If the Company sought to charge interest on these accounts, it could collect up to six percent per year without raising a licensing obligation.

Letter at 4.

*Answer*

The scope of the CDCA was addressed above and need not be addressed here.

As a general matter, and as stated above, the Department agrees with your assertion that an unlicensed entity does not violate the CDCA or the LIPL if that entity acquires loan contracts originated under the CDCA but only contracts to charge interest, fees and other charges that aggregate to no more than 6% simple interest *per annum*.  Of course, the Department would only permit such an unlicensed entity to purchase such CDCA loan contracts pursuant to 7 P.S. § 6214.I and 10 Pa.Code § 41.6(a) if the entity agreed, in writing, to limit itself to charging only up to 6% simple interest *per annum* for all interest, fees and other charges.  Aside from simple prudence, the Department would require such a written contract from an acquiring entity so that the entity would not violate the CDCA.  Section 3.A of the CDCA makes it unlawful for unlicensed persons to even, "***contract for*** or receive interest, discount, bonus, fees, fines commissions, charges, or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act . . ." 7 P.S. § 6203.A (emphasis added).

However, despite the Department's general agreement with your assertion, a word of caution is in order. It is the Department's understanding that loan balances owed to CDCA licensees frequently already include the interest owed in the loan balance itself. For example, Client may purchase a loan from a CDCA licensee with a balance owed of $10,000 and that figure would already include the interest and other charges owed that far exceed 6% simple interest *per annum*. If Client is not licensed under the CDCA and not otherwise authorized to impose interest, fees and other charges in excess of 6% simple interest *per annum* as provided for in a loan contract, then Client would need to ensure that every loan contract it acquired did not already include in the balance owed interest, fees and other charges in excess of the general usury limit. If a loan balance did include interest, fees and other charges in excess of the general usury rate, Client would need to determine the amount of principal owed on the loan and would only be able to contract for and receive interest, fees and other charges permissible at the 6% simple interest *per annum* general usury rate.

Question #10

You state in your letter:

> In acquiring the accounts described herein that are subject to the CDCA (closed-end installment loans and revolving loan accounts of $25,000 or less), the Company intends to collect only the outstanding balance on the account, which may include interest that had accrued at a rate in excess of six percent. In our conversation, you suggested that the balance in the account, including the outstanding principal and such accrued interest, possibly could be collected without raising a licensing obligation under the CDCA if the Company did not seek to charge additional interest in excess of six percent on the account once acquired, but that the matter would need to be discussed with the Department's counsel. We would appreciate clarification on this point so that the Company knows the extent of the outstanding balance it can collect without triggering a license obligation.

Letter at 5. You also state in a footnote that, "[b]efore charging any new interest on accounts with accrued interest, the Company, of course, would review Pennsylvania law to ensure that there is no compound interest restriction. Letter at 5 n.1.

*Answer*

*Charging Additional Interest*

As explained above, the outstanding balances owed by consumers under CDCA loan contracts may include interest owed at a rate higher than the general usury rate.

Unless Client acquires the statutory authority to charge, contract for or receive interest in excess of the general usury statute, Client may only collect interest at the rate of 6 per cent *per annum* on CDCA loans acquired and only if the Department approves of the transfer of such loan contracts to an unlicensed person or entity pursuant to 7 P.S. ? 6214.I and 10 Pa. Code § 41.6(a).

You also raise the issue of whether additional interest may be charged for a loan after it is in default. The Department notes that you did not explain under what authority Client proposes to charge additional interest on a loan that has already come to maturity and is in default.

Of course, CDCA licensees may extend, defer, renew or refinance loan contracts under the CDCA. 7 P.S. § 6213.K and L. However, your question does not expressly state that it is asked in the context of extending, deferring, renewing or refinancing CDCA loan contracts.

The CDCA comprehensively governs every kind of interest, fee and charge of any kind whatsoever that may be imposed by a licensee on a consumer. As the pertinent provision states:

> [a] licensee shall not charge, contract for, collect or receive interest, discounts, fees, fines, commissions, charges or other considerations in excess of the interest or discount, service charges, extension charges, deferment charges, default charges, recording and satisfaction fees, premiums for insurance, attorney's fees, court costs, repossession expenses, storage charges, and selling expenses authorized by the provisions of this act.

7 P.S. 6214.B. If a charge is not authorized by the CDCA, then it is impermissible to impose it on a consumer, regardless of whether or not the charge constitutes consideration for the loan. For instance, if Client held a CDCA license, it could impose default fees on a debtor. 7 P.S. § 6213.K; 10 Pa. Code §§ 41.3(d), 41.3a. However, if Client, as an unlicensed purchaser and with the Department's prior approval, acquires CDCA loan contracts pursuant to the CDCA without any kind of statutory authority, then it may only collect interest or other charges at a rate of up to six per cent *per annum*, and may not impose any other kind of charge since all charges are regulated by the CDCA.

*Compound Interest*

In footnote number 1 of your letter, you refer to the charging of additional interest by Client on interest already charged to a debtor on a CDCA loan contract as, "compound interest." Letter at 5 n. 1. The Department notes that the Pennsylvania Supreme Court has held that:

> [i]t is fairly well established that the law in this
> Commonwealth frowns upon compound interest and as
> such will only permit compound interest on a debt when the
> parties have provided for it by agreement or a statute
> expressly authorizes it.

*Powell v. Allegheny County Retirement Board, 246 A.2d 110, 115 (Pa. 1968). See also Pennsylvania State Education Association with Pennsylvania School Service Personnel/PSEA v. Appalachia Intermediate Unit 08, 476 A.2d 360, 363 (Pa. 1984); Acker v. Provident National Bank, 512 F.2d 729, 739-742 (3rd Cir. 1975).* As explained above, Since the CDCA governs all kinds of charges that may be imposed by a CDCA licensee, 7 P.S. ? 6214.B, a CDCA licensee and a debtor are not free to contract for compound interest if it is not permitted under the CDCA.

The Department has reviewed the CDCA and takes the position that the CDCA does not specifically authorize "compound interest" as that term is generally understood. The term "compound interest" is broadly understood to mean:

> [i]nterest that is paid not only on the principal, but also on
> any interest earned but not withdrawn during earlier
> periods. Interest upon interest; *i.e.*, when the interest of a
> sum of money is added to the principal, and then bears
> interest, which thus becomes a sort of secondary principal.

Blacks Law Dictionary, 6th Edition (West 1990). Section 13 of the CDCA governs the interest rate that a CDCA licensee may charge. One method of calculating the interest rate authorized by Section 13 is referred to as the "discount" rate. *See* 7 P.S. § 6213.E and H. The "discount" rate involves calculating the authorized interest rate based on the time balance of a loan contract at the time the loan contract is made to a consumer and not just on the principal amount owed. Part of this calculation does involve interest being charged on interest. However, since the "discount" rate calculation is made at the beginning of the loan contract and all payments are known at the time the loan is made, this does not present the typical situation involving compound interest in which the amount of interest owed continues to balloon geometrically to an amount not specifically agreed to by both parties.

Furthermore, Section 13 of the CDCA does not authorize the kind of "compound interest" that your Client would like to impose. Client is contemplating the possibility of imposing additional interest on CDCA loan contracts that are in default and for which the interest rate has already been calculated. Letter at 5. Nowhere does the CDCA authorize the unilateral imposition of the kind of interest that you suggest in your letter. Assuming Client possessed the requisite statutory authority, and as noted above, a CDCA licensee may extend, defer, renew or refinance loan contracts under the CDCA. 7 P.S. § 6213.K. and L. And, as discussed below, a CDCA licensee may impose default charges. 7 P.S. § 6213.K. But the CDCA provides no authority for a CDCA licensee to unilaterally add interest charges to an existing loan contract.

*Charges for the Detention of Money*

The United States Court of Appeals for the Third Circuit recently held in *Pollice v. National Tax Funding, 225 F.3d 379 (3rd Cir. 2000)*, that certain charges may be imposed after a loan has matured without running afoul of the LIPL. The Department writes to clarify this area of the law as it relates to the CDCA.

The relevant issue in *Pollice* was whether the LIPL recognizes a distinction between:

> . . . on the one hand, charges imposed on account of a debtor's failure to make timely payment of money when due ("detention"), and on the other, money received by a creditor as consideration for agreeing to refrain from immediately collecting a debt ("forbearance").

*Pollice, 225 F.3d at 392-393.* The former constitutes the detention of money. The court in Pollice predicted that the Pennsylvania Supreme Court would rule that charges for the "detention" of money are not subject to the LIPL because they are not imposed as consideration for the loan or use of money. *Id., 225 F.3d at 394-395, 399.*

First, the Department respectfully finds the Third Circuit's analysis to be thorough. However, as all federal courts readily acknowledge, the Pennsylvania Supreme Court has the final word on interpreting Pennsylvania law and, to the best of the Department's knowledge, that court has not ruled on the issues decided by the Third Circuit in *Pollice* as they apply to the LIPL[10] or the CDCA. Therefore, the Department reserves judgment on whether the doctrine of law concerning charges imposed for the detention of money exists in Pennsylvania as it relates to the LIPL.

Second, regardless of whether the doctrine concerning the detention of money exists with respect to the LIPL, the Third Circuit in *Pollice* did not discuss the applicability of that doctrine to the CDCA as the Department discusses below.

The Third Circuit held in *Pollice* that usury is founded on an agreement between two parties. *Pollice, 225 F.3d at 394-395.* Thus, according to the court in *Pollice*, an agreement is a necessary predicate in order for usury to exist:

> [a]ll the terms of the statute denote consensual agreements between the parties, indicating that a withholding or detention by the borrower not consented to by the lender is not within the statute's purview. ***The mere fact that the***

---

[10] It would appear that the Pennsylvania Supreme Court has discussed the detention of money under the 19th Century usury statute that preceded the LIPL. *See In re Kenin's Trust Estate, 23 A.2d 837, 844 n. 4 (Pa. 1942)*.

> ***parties have agreed to the rate to be paid after the debt is***
> ***due does not make an arrangement a forbearance.***

*Pollice, 225 F.3d at 394, quoting Smith Machinery Co. v. Jenkins, 654 F.2d 693, 696 (10th Cir. 1981) (emphasis added).*

Without passing upon the correctness of the holding in *Pollice*, charges for the "detention" of money as described in *Pollice* are, in essence, default charges. Default charges are strictly regulated by the CDCA even though they, unlike extension or deferment charges,[11] are not the subject of an agreement between a licensee and a debtor. A licensee may simply impose the permissible default charges after compliance with the requirements of the CDCA:

> [t]his act requires that ***due notice*** of a licensee's intention to collect default charges be given to the consumer in the statement of contract. A licensee may, ***upon notice***, collect a specified default charge on loan contracts at the rate permitted in the act on the amount in default.

10 Pa. Code § 41.3(d) (emphasis added). *See also* 7 P.S. §§ 6213.K, 6215 and 10 Pa. Code § 41.3a. Even though no agreement is in place for a CDCA licensee to impose a default charge, it may nonetheless impose a default charge. Thus, unlike the *Pollice* court's interpretation of the LIPL, the CDCA clearly governs charges for the detention of money even though they are not the subject of an agreement.

The *Pollice* court also noted that consideration for an agreement was necessary in order for usury to attach and fees for the detention of money were not imposed for consideration:

> [Usury statutes] apply only to those contracts which in substance involve a loan of money or forbearance to collect money due, and so, where there is no loan or forbearance, there can be no usury . . . . A charge imposed because of the late payment of a debt comes within the definition of interest under a usury statute only where it is paid as ***consideration*** for the creditor's forbearance of asserting his right of collection.

*Pollice, 225 F.3d at 394, quoting 47 C.J.S. Interest & Usury § 122 (1982) (emphasis added).* As noted above, the CDCA expressly regulates default charges even though a

---

[11] "[a]n extension arises from a ***written agreement***, other than the original loan contract, between a consumer and a licensee to alter the payment schedule in the original loan contract or to postpone one or more scheduled payments to the end of the contract. A deferment arises from a ***written agreement***, other than the original loan contract, between a consumer and a licensee to postpone one or more scheduled payments for a specified period of time other than to the end of the contract. Each extension or deferment shall be negotiated separately." 10 Pa. Code § 41.3(e) (emphasis added).

licensee merely imposes them on a debtor and not as part of the consideration given for a CDCA loan agreement.

Although the court in *Pollice* did not address the CDCA, it did note that the rule it approved concerning the detention of money applies, "[i]n the absence of language in the usury statutes that compels a different conclusion . . ." *Pollice, 225 F.3d at 393*. The Department takes the position that the CDCA is the kind of a statute that compels such a different conclusion in that it regulates all charges of any kind whatsoever, including charges for the detention of money.

*Question #11*

You state in your letter:

> [w]ith each sale and purchase transaction involving a pool of CDCA loans, a CDCA licensee must provide notice to the Department if it sells loans to a licensee, but must obtain approval of the Department to sell loans to a non-licensee. As you have indicated, the Department wants to ensure that a non-licensee has interest rate authority (as would a chartered financial institution) or agrees to not charge interest in excess of six percent per year on the loans acquired, unless licensed. Although this approval is handled on a transaction-by-transaction basis, we respectfully request that the Department consider accepting an annual certification from the Company that, to the extent it acquires loans subject to the CDCA from CDCA licensees and seeks to charge interest on such credit obligations, the Company will not charge or collect interest at a rate that exceeds six percent per year on the outstanding balance.

Letter at 5.

*Answer*

The Department declines your request to accept an annual certification from Client as stated in your Letter, although the Department reserves the right to reconsider this issue in the future.

*Question #12*

You state in your letter:

> [f]inally, I also request consideration by the Department of another issue under the Act. As all of the accounts

purchased by the Company are charged off consumer credit accounts or accounts of a debtor in bankruptcy, arguably the accounts would no longer be subject to the CDCA as there is no agreement to pay a sum certain of money by a fixed or determinable time. As the loans are in default, the agreement by the consumer to pay has been breached. Without an agreement in place, the charged-off accounts do not appear to be subject to the CDCA for purposes of licensing an entity that purchases such charged-off accounts. I would appreciate consideration of this position.

Letter at 6.

*Answer*

The Department takes the position that the CDCA governs all loan contracts entered into thereunder at all times, including when loan contracts have been breached by one or all of the parties thereto. For instance, a default constitutes a breach of a loan contract[12] and the CDCA, as noted above, nonetheless governs the kinds of charges that may be imposed on a debtor for a default. 7 P.S. §§ 6213.K, 6215; 10 Pa.Code §§ 41.3(d), 41.3a. Charging off a loan is an internal accounting decision made by a lender and does not effect the legal validity of the loan agreement.

*Advisory*

Pursuant to the Commonwealth Attorneys Act, 71 P.S. § 732-101 *et seq.*, the undersigned may only give legal advice to the Department and may not divulge that legal advice or other confidential matters, such as attorney-client communications, to anyone without permission from the Department. No such permission has been given in this case. Therefore, this letter represents the policy positions of the Department and is not intended to disclose privileged and confidential legal advice provided by the Office of Chief Counsel. Accordingly, this letter may not be relied upon or construed as constituting legal advice. This letter constitutes a duly authorized statement of the Department's official position regarding the issues discussed herein and has been authorized by the appropriate Department personnel. The Department's analysis is based upon the facts as stated in this letter. Any change in the facts could result in an amendment or reversal of the Department's position.

Sincerely,

David H. Bleicken
Deputy Chief Counsel

---

[12] The CDCA defines "default" as, "failure to pay a contract when due or failure to pay any stated installment when due." 7 P.S. § 6202.

Enclosure

CERTIFIED MAIL

7017 3040 0000 9360 8938



FIRST-CLASS

PITNEY BOWES

US POSTAGE
$ 008.85⁰
02 1P
0002606263     MAR 18 2021
MAILED FROM ZIP CODE 15219

Moynihan Law, P.C.
2 Chatham Center, Suite 230
Pittsburgh, PA 15219

**Quantum3 Group, LLC**
**12006 98th Ave NE, Suite 200**
**Kirkland, WA 98034-4218**